UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| STACEY STANTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | CIVIL ACTION NO. 04-10751-NG |
| v. | ) | |
| | ) | |
| METRO CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM
## IN SUPPORT OF MOTION TO DISMISS

Defendant Metro Corp. submits this memorandum of law in support of its motion to dismiss the Amended Complaint of plaintiff Stacey Stanton ("Stanton").

Plaintiff alleges that a photograph showing her at a high school dance was published in *Boston* magazine in such a way as to defame her and portray her in an actionably false light. As set forth in detail below, plaintiff's Amended Complaint must be dismissed because neither the photograph nor the article it illustrated convey any false or defamatory facts about her, and because her allegations fail to state any claim recognized under Massachusetts law. Fed. R. Civ. P. 12(b)(6).

## FACTUAL BACKGROUND[1]

This case arises out of the publication of a color photograph that covers three-quarters of a two-page spread in the May 2003 issue of *Boston* magazine. (See Ex. A to this memorandum, at 118-119.) The photograph depicts five students outside a high school dance (Am. Complaint,

---

[1] For purposes of this motion to dismiss only, Metro Corp. takes as true the factual allegations set forth in the Amended Complaint, and also relies on the photo essay and article, as published in *Boston* magazine in May 2003, a true copy of which are attached to this memorandum as Ex. A. It is proper for

¶ 5) or, judging from their attire, their high school prom. Although congregated near the exit door, for the most part they do not appear to be interacting with one another. The student nearest to the door, dressed in a dark tux and bow tie, smokes on a cigarette and looks to the side, a serious expression on his face. In front of him is a blond-haired male with an unlit cigarette in his mouth. His jacket has been removed and his hands are in the pockets of his trousers. He is glancing at a female student who appears only in profile on the right-hand side of the photograph; she is puffing on a just-lit cigarette held between her fingers, and one can see that her nails are painted burgundy. At the far left, also in profile, is a young woman in a plum-colored gown, her blond hair pulled back from her forehead. She holds a plastic cup and her blue eyes are gazing straight ahead, as if watching activity taking place to the photographer's right. The fifth student, wearing an elegant black sleeveless dress, is neither smoking nor drinking. Her brunette hair falls in curls to her shoulders, and around her neck is a gold-chain necklace with a heart-shaped pendant. Of the five people in the photograph, she is the only one who appears to be looking in the photographer's direction, and there is a friendly expression on her face. Upon information and belief, she is the plaintiff in this action.

   Nothing in the photograph suggests that any of the students are engaged in illegal or improper behavior. None of them are hugging, kissing, or touching; none are smoking joints or carrying themselves in an undignified fashion; there is no suggestion even that the one girl's

---

this Court to consider the photo essay and article despite plaintiff's failure to append them to her Amended Complaint. When reviewing a motion to dismiss, a court may consider "documents central to plaintiffs' claim" or "documents sufficiently referred to in the complaint" even if those documents are not attached to the complaint. Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993) (citing cases). Indeed, on a motion to dismiss a libel claim, it is common for a court to examine the challenged publication (even when submitted with the defendant's motion) without converting the motion into one for summary judgment. See Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012 (1st Cir.), cert. denied, 488 U.S. 821 (1988) (holding that district court acted properly on motion to dismiss libel case by considering the allegedly libelous article which was central to plaintiff's claim, even though plaintiff did not attach it to the Amended Complaint).

plastic cup contains any alcoholic beverage.  Indeed, what is most striking about the photograph

is how elegant, sophisticated, and mature the five students appear.  Plaintiff's Amended

Complaint does not allege that the photograph, standing alone, is defamatory in any way.

To the right of the photograph is the beginning of a magazine article that extends through

the next four pages of the magazine, and then continues on a single column at the back of the

issue.  What one notices first about the article is its black-type headline that moves down the

page like a ladder: "The Mating Habits of the Suburban High School Teenager."  Above that

headline, in smaller, gold type, is this subhead:  "They hook up online.  They hook up in real life.

With prom season looming, meet your kids – they might know more about sex than you do."

Bylines at the bottom of the page identify not only the writer of the article, but also the

photographer who created the photo essay: "Photo essay by DAN HABIB."  (Ex. A, at 119.)

Where one would expect to see the caption to the opening photograph, adjoining the

photograph, there is instead a disclaimer explicitly advising the reader that the photo essay and

the textual narrative are independent treatments, in different formats, of the topic of teen

sexuality.  The disclaimer is set off in italic type:

> *The photos on these pages are from an award-winning five-year project*
>
> *on teen sexuality by photojournalist Dan Habib.  The individuals pictured*
>
> *are unrelated to the people or events described in this story.  The names of*
>
> *the teenagers interviewed for the story have been changed.*

(Id.) The photo essay continues on the subsequent two-page spreads of the article, and consists

of six smaller photographs, also without captions, placed side by side in a two-inch-high

horizontal strip that graphically pierces the text over the next four pages of the magazine.  These

bands of photos are graphically separated from the text in such a way that there is no implication

that the photos are referring to the text, or, for that matter, that the text is making reference to the photos. (See Ex. A, at 120-21, 122-23.)  Plaintiff does not appear in any of them.

Those six smaller photos that make up the remainder of the photo essay depict adolescents in a striking variety of scenes.  In one, the foreground shows two girls air-kissing as a third girl appears to push them towards each other; in the background, a boy and girl are locked in an embrace.  Another photo shows an adolescent girl in a one-piece swimsuit, holding a towel over her body as a boy in swim trunks looks in her direction.  Other photographs show someone with what appears to be an inflated condom over his head; two males sitting by a pool while a female is swimming; a young woman sitting alone, contemplative, but surrounded by what appears to be a kaleidoscopic whirlwind of bustling people; a male and female, dressed formally, in the midst of a kiss.  While all of the photos appear to make a visual comment of some kind on the broad topic of "teen sexuality," none of them depict sexual behavior that is more explicit than a kiss, and none suggest that the individuals portrayed have engaged in improper or illegal conduct.  Plaintiff does not appear to claim otherwise.[2]

In alleging that plaintiff has been defamed or put in a false light, the Amended Complaint puts emphasis instead on selected portions of the narrative discussion contained in the article that begins on the same page as the photo essay.  (See Am. Complaint, ¶ 12.)  That article addresses the topic of teen sexuality from a wide range of different perspectives.  It cites recent news

---

[2] As noted in the disclaimer, the photographs come from an award-winning project by photographer Habib.  While plaintiff asserts that she "was not the subject of, nor did she participate in," that project, it is indisputable that the photograph that includes her, and that was published in *Boston* magazine, was in fact shot by Habib and included as part of his teen sexuality project.  Attached to this memorandum as Ex. B is a true copy of the "Overview" section of Habib's website as it appeared on March 23, 2004; the photograph including the plaintiff can be seen on the third page.  (It appears that the photograph has since been removed from the website.)  Inclusion of excerpts from Habib's teen sexuality site, for consideration by this Court with the motion to dismiss, is appropriate because the project is "central to plaintiff's claim" and "sufficiently referred to in the Complaint."  See note 1, supra, and cases cited.  Therefore, this Court may consider Exhibit B without converting this motion to one for summary judgment; should this Court rule otherwise, Metro Corp. asks that the exhibit be excluded and the motion not converted.

events such as a "sex scavenger hunt at Newton South High School" and a report of two teens engaging in oral sex while riding on a school bus at Silver Lake Regional High School in Kingston. (Ex. A, at 120.) It reports statistics from the Centers for Disease Control, from Columbia University's National Center for Addiction and Substance Abuse, and from Planned Parenthood. (Ex. A, at 120, 122, 123.) It quotes academics (authors of books called *The Sex Lives of Teenagers* and *Sexual Intelligence*), psychologists (including a Boston University-trained expert in Internet behavior), and advocates (including the head of a Washington, DC-based organization that calls itself a "guerrilla sex-education" group). (Ex. A, at 120, 121, 122, 123.) It points out the "skyrocketing" rise in the number of teens having who have engaged in sexual intercourse, compared to 30 years ago. (Ex. A, at 120.) It examines how teenagers learn about sex today, and points to such influences as the Internet, Bill Clinton, sexually explicit Abercrombie & Fitch catalogs, and Christina Aguilera. (Ex. A, *passim*.) It discusses the impact of federal spending on abstinence education and the concomitant restrictions on classroom discussion of contraceptive methods. (Ex. A, at 121-22.) It decries the increasing sexual aggression on the part of teenage boys, and the increasing abuse, and loss of faith in relationships, suffered by teenage girls. (Ex. A, at 123.)

The article also liberally quotes teenagers from throughout eastern Massachusetts, using the teens' own words – but, as pointed out in the disclaimer, without using their real names. Some of those teens discuss "hooking up" – a term that the author calls "loaded and vague," referring to "anything from sexual intercourse … to just kissing." (Ex. A, at 120.) One speaks of having multiple sexual partners, another says he engages in "R-rated flirting" on the Internet, and yet another vows that she would "rather be alone" than be in a relationship where she is treated poorly. (Ex. A at 120, 121, 171.)

5

Plaintiff does not allege that the article refers to her by name, identifies her, or indeed alludes to her in any way. Nor does she allege that a reader of the article is likely to confuse her with any of the particular teenagers quoted in it. Indeed, she does not dispute the factual accuracy of the disclaimer's statement that the "individuals pictured are unrelated to the people or events described in this story." (Ex. A, at 119.) Nevertheless, plaintiff alleges that the photograph "insinuated that the Plaintiff was a person engaged in the activity described in the article" (Am. Complaint, ¶ 14) – by which she presumably is referring *not* to the activity of abstinence, or the activity of forswearing relationships with boys, but rather the activity of "hooking up" or engaging in "sexual experimentation" (see Am. Complaint, ¶12).

Eight months after her photograph was published in *Boston* magazine, plaintiff – who lives in Manchester, New Hampshire – commenced this action against the magazine's parent company, Metro Corp., in Worcester (Mass.) Superior Court.[3] Metro Corp. removed it to the United States District Court for the District of Massachusetts on April 13, 2004. The Amended Complaint has two counts. Count I alleges "statutory invasion of privacy" pursuant to Mass. Gen. Laws c. 214, § 1B, as a result of Metro Corp.'s portraying plaintiff "in a false light in the public eye." (Am. Complaint, ¶¶ 8-9.) Count II alleges defamation. (Am. Complaint, ¶¶ 10-19.)

## ARGUMENT

### I.    Pre-Trial Disposition of Claims Is Favored in Defamation Cases.

Because defamation is a traditionally disfavored action, Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 432 n.7 (1991), this Court should not hesitate to allow a well-founded motion to dismiss. As the Massachusetts Supreme Judicial Court has noted, "Even if a defendant in a libel case is ultimately successful at trial, the costs of litigation may induce an unnecessary and undesirable self-censorship." King v. Globe Newspaper Co., 400 Mass. 705, 708 (1987).

---

[3] It is unclear why plaintiff chose to commence suit in Worcester. It appears that the case's only connection to Worcester County is that plaintiff's attorney has his office there. (Am. Complaint, p.3.)

The costs of such self-censorship are particularly high where the defendant is reporting on matters of significant public concern – such as, here, the increase in sexual activity among teenagers, the resulting risks to adolescents' physical and emotional health, and the failure of parents and politicians to counter the increasingly sexual messages of popular culture.[4]

On this motion to dismiss, the Court must accept as true all *well-pleaded* factual allegations in the Amended Complaint and must draw all *reasonable* inferences in favor of the plaintiff. See Rockwell v. Cape Cod Hosp., 26 F.3d 254, 255 (1st Cir. 1994); Chongris v. Board of Appeals, 811 F.2d 36, 37 (1st Cir. 1987). However, the Court need not – and, to protect speech on this matter of public concern, should not – indulge plaintiff's "bald assertions," "unsupportable conclusions," or other assertions that are "conclusively contradicted" in the record. Chongris, 811 F.2d at 37. That is particularly so where, as here, the Court has before it the full text of the challenged publication (see Ex. A), and so is in a position to assess for itself the publication's defamatory tendencies. See, e.g., Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1018 (1st Cir. 1988) (affirming Rule 12(b)(6) dismissal of defamation and false light claims arising out of publication of plaintiffs' photograph in sexually explicit magazine, because challenged statement is incapable of bearing a defamatory meaning); Tropeano v. Atlantic Monthly Co., 379 Mass. 745 (1980) (affirming Rule 12(b)(6) dismissal of plaintiff's libel claim arising out of publication of her photograph to illustrate article on sexual mores, because the publication is not defamatory on its face); Albright v. Morton, No. 02-11458, slip op. (D. Mass. May 28, 2004) (Gertner, J.) (pursuant to Rule 12(b)(6), dismissing defamation, invasion of privacy, and other claims arising out of erroneous photo caption that plaintiff claimed impugned his sexuality).

---

[4] See also note 6, infra. For such reasons, this Court has sometimes required defamation plaintiffs to satisfy a stricter pleading standard than plaintiffs pursuing other claims. See Chiara v. Dizoglio, 81 F. Supp. 2d 242, 248 (D. Mass. 2000); Dorn v. Astra USA, 975 F. Supp. 388, 395-96 (D. Mass. 1997).

II.     **The Amended Complaint Fails to State a Claim for Defamation.**

Plaintiff alleges she was defamed in two different ways. She claims, first, that the juxtaposition of the photograph and the article implies that she was a sexually promiscuous teenager; this is her "libel-by-juxtaposition" claim. (Am. Complaint, ¶ 13.) Second, she says, she is defamed by the statement that the photograph of her was "from an award-winning five-year project on teen sexuality by photojournalist Dan Habib"; this is her "libel-by-endorsement" claim. (Am. Complaint, ¶¶ 15-17.) Neither allegation states a cognizable claim for libel.

For a non-public figure[5] like plaintiff to maintain an action for defamation, she must prove that the statements at issue were "of and concerning" her, see Massachusetts School of Law v. American Bar Assoc., 142 F.3d 26, 42 (1st Cir. 1998); Eyal v. Helen Broadcasting Co., 411 Mass. 426, 429 (1991), and were defamatory, see Canney v. City of Chelsea, 925 F. Supp. 58, 70 (D. Mass. 1996). Because Metro Corp. is a media defendant and the publication was on a matter of public concern,[6] plaintiff also bears the burden of proving that each of the challenged statements was "materially false," Yohe v. Nugent, 321 F.3d 35, 41 (1st Cir. 2003), citing Dulgarian v. Stone, 420 Mass. 843, 847 (1995), and that Metro Corp. published them with "negligent disregard for the truth," Brown v. Hearst Corp., 54 F.3d 21, 26 (1st Cir. 1995).

A.     **Plaintiff's Libel-by-Juxtaposition Claim Fails Because the Challenged Publication is Not Capable of Defamatory Meaning.**

The threshold issue on plaintiff's libel claim is whether the "statement" created by the juxtaposition of photograph and text is reasonably susceptible of a defamatory meaning,

---

[5] Metro Corp. assumes, for purposes of this motion to dismiss only, that plaintiff is a non-public figure, who therefore carries a lighter burden of proof than the "actual malice" standard reserved for public figures. Brown v. Hearst Corp., 54 F.3d 21, 26 (1st Cir. 1995).

[6] There can be little question that the sexual mores of teenagers, and the related physical, emotional, social, health, and political issues raised for society, are a matter of public concern. See, e.g., "Friends, Friends With Benefits and the Benefits of the Local Mall," *The New York Times Magazine*, May 30, 2004; "Choosing Virginity," *Newsweek*, Dec. 9, 2002; "Risky Business: Today's Teens Participating in Dangerous Sexual Behavior," *Dateline NBC,* Jan. 2, 2001.

which is a question of law for the court. <u>Brown</u>, 54 F.3d at 26; <u>Massachusetts School of Law</u>,

142 F.3d at 42; <u>Canney</u>, 925 F. Supp. at 70; <u>Albright</u>, slip op. at 6-7.  To be defamatory, a

statement "must hold the plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair his

standing in the community, at least to his discredit in the minds of a considerable and respectable

class in the community." <u>Yohe</u>, 321 F.3d at 39, <u>quoting</u> <u>Tartaglia v. Townsend</u>, 19 Mass. App.

Ct. 693, 696 (1985).  If the statement created by the magazine's publication is not susceptible of

a defamatory meaning, then the libel claim must be dismissed.  <u>See, e.g.,</u>  <u>Albright</u>, slip op. at 6-7

(holding, on Rule 12(b)(6) motion, that plaintiff is not defamed by magazine's erroneous

publication of homosexual entertainer's photograph above caption listing plaintiff's name,

because "no reasonable view" of the photo and text together would suggest that plaintiff was

gay).

　　　　In determining whether a statement is capable of defamatory meaning, the court must

"examine the statement in its totality in the context in which it was uttered or published," and

must "consider all the words used, not just merely a particular phrase or sentence." <u>Myers v.</u>

<u>Boston Magazine Co.</u>, 380 Mass. 336, 341-42 (1980). <u>See also</u> <u>Albright</u>, slip op. at 7; <u>Canney</u>,

925 F. Supp. at 70 (allegedly defamatory statement must be examined "in its totality and in the

context in which it was published").  The court must also "give weight to cautionary terms used

by the person publishing the statement." <u>Aldoupolis v. Globe Newspaper Co.</u>, 398 Mass. 731,

734 (1986), <u>quoted in</u> <u>Protective Factors, Inc. v. American Broadcasting Cos.</u>, No. 01-CV-11668,

2002 U.S. Dist. LEXIS 12399 (D. Mass. May 28, 2002) (O'Toole, J.); <u>Lyons v. Globe</u>

<u>Newspaper Co.</u>, 415 Mass. 258, 263 (1993).

　　　　The requirement that a publication be "viewed as a whole" has particular force in cases

where, as here, the plaintiff is alleging that she is defamed by juxtaposition.  <u>Brown</u>, 54 F.3d at

27.  In <u>Brown</u>, the First Circuit considered the argument that by juxtaposing a television news

report on the plaintiff – who was a suspect in connection with his wife's disappearance – with a report on an infamous "woodchipper murder," a broadcaster had implied that the plaintiff had not only killed his wife but had also brutally destroyed her body. After examining the full broadcast, the court concluded that "no reasonable juror" could draw that inference, noting that much of the program had "developed and accentuated the charge of murder," but "virtually nothing tended to suggest that the body was brutally destroyed." Id. at 26-27.

Plaintiff in this action claims that she was defamed by the juxtaposition of her photograph with the teen sexuality article, such that the photo somehow "insinuated" that she "engaged in the activity described in the article." (Am. Complaint, ¶ 14.) After reviewing the photograph and the article as published, however, it is difficult to see how the photograph "insinuates" anything less than positive about the plaintiff (see pages 1-3, supra) – and equally difficult to imagine what "activity" described in the article could reasonably be ascribed to the plaintiff simply because her photograph appears nearby.

This case has arisen before. In Tropeano v. Atlantic Monthly Co., 379 Mass. 745 (1980), a woman sued over the publication of her photograph to illustrate a story entitled "After the Sexual Revolution," dealing with "modern sexual and social mores." 379 Mass. at 745. The plaintiff (as Ms. Stanton alleges here, see Am. Complaint, ¶ 6), had not authorized the publication. 379 Mass. at 745. There was nothing defamatory about the photograph standing alone: It depicted four well-dressed young women, including the plaintiff, conversing in a group, while a young man in the background appeared to be clapping his hands and dancing to music. 379 Mass. at 751. The Supreme Judicial Court rejected plaintiff's libel claim, holding that the publication was not defamatory on its face, and that plaintiff had not pleaded the existence of any surrounding circumstances that would render it defamatory. The Court therefore affirmed dismissal of the plaintiff's action for failure to state a claim. Id.

Plaintiff would apparently have this Court declare that by juxtaposing the photo and article, Metro Corp. has ascribed "sexual promiscuity" to the plaintiff. (Am. Complaint, ¶¶ 13, 14.) However, there is a wide range of "activity" described in the article, some of it arguably harmful to reputation (such as "hooking up" with multiple partners) and some of it clearly not (such as attending a school prom, watching Britney Spears videos, abstaining from sex, vowing to avoid abusive relationships, or even lying about engaging in sex in order to defuse the pressure from peers who keep asking about it). Even if one could conclude that the article can somehow be read as referring specifically to the plaintiff,[7] still there is nothing at all in it to suggest *which* of the "activity" discussed in the article should be ascribed to her. The law does not permit plaintiff to base a libel claim "solely on a reading that interprets the language in the most negative way possible." Veilleux v. National Broadcasting Co., 206 F.3d 92, 108 (1st Cir. 2000). Rather, this Court must adopt instead the "most plausible interpretation" of the "statement" created by the juxtaposition of photo and text. See Veilleux, 206 F.3d at 108.

Clearly, the "most plausible interpretation" – indeed, the only reasonable one – is that there is no defamatory statement alleged. That is particularly so in light of case law establishing that if any "defamatory tendency" of a challenged publication is "somewhat amorphous, … rather than specific and significant," then a libel action cannot proceed. Tartaglia, 19 Mass. App. Ct. at 698-99. For example, in National Ass'n of Gov't Employees v. Central Broadcasting Co., 379 Mass. 220 (1979), the Massachusetts Supreme Judicial Court dismissed a libel claim because, to the extent that calling plaintiff a "communist" carried any meaning beyond epithet, "it was too vague to be cognizable as the subject of a defamation action." See also Buckley v. Littell, 539 F.2d 882, 893, 895 (2d Cir. 1976) (dismissing libel because calling plaintiff a "fellow traveler" of fascism is too "loosely definable" and "variously interpretable"). Because it is

---

[7] Such a conclusion would be patently unreasonable. See section II.B, infra.

11

entirely uncertain *what aspects* of the teen sexuality article could be said to refer to the plaintiff, it cannot reasonably be said that the photograph insinuates any particular defamatory fact – and therefore no libel claim can be successfully asserted. Tartaglia, 19 Mass. App. Ct. at 698-99.

That conclusion is powerfully reinforced by the presence of the written disclaimer next to the plaintiff's photograph. See Aldoupolis, 398 Mass. at 734 (advising that court must give weight to "cautionary terms" used by the publisher of the alleged defamatory statement). The disclaimer explicitly provides that "[t]he individuals photographed are unrelated to the ...events described in this story." (Ex. A, at 119.)   To the extent that any reader could possibly harbor uncertainty about whether specific conduct described in the article is being ascribed to the students photographed outside their high school prom, the disclaimer removes all doubt. It leaves no reasonable question in a reader's mind that the photograph of the plaintiff is not capable of bearing a defamatory meaning.

**B.      Plaintiff's Libel-by-Juxtaposition Claim Fails Because the Alleged Defamation is Not "Of and Concerning" the Plaintiff.**

Even if the juxtaposition of the article and photo essay could be said to convey some defamatory meaning (which it cannot, for the reasons stated above), still plaintiff could not prevail on her defamation claim because she cannot show that the defamatory statement is "of and concerning" her in particular. See Eyal, 411 Mass. at 429; ELM Medical Lab., Inc. v. RKO General, Inc., 403 Mass. 779, 784 (1989).  To demonstrate that the supposed defamatory inference of the publication was "of and concerning" her, the plaintiff must prove either that (1) the defendant intended to refer to the plaintiff and the words were so understood, or (2) the defendant's words reasonably could be interpreted to refer to the plaintiff and the defendant acted negligently in publishing the statement in such a way that the statement could be so understood. See Eyal, 411 Mass. at 429-31; ELM Medical, 403 Mass. at 785.  Plaintiff cannot prove either the subjective or the objective prong of that test.  The disclaimer printed adjacent to

plaintiff's photograph states plainly that the "individuals pictured are unrelated to the people or events described in this story." (Ex. A, at 119.) It negates any possible inference that Metro Corp. "intended" for the article to refer to the plaintiff. It also erases any chance that a reasonable reader would interpret the article as referring to the plaintiff, and demonstrates that Metro Corp. was not negligent in publishing the article and photo essay in such a way that a defamatory statement can be reasonably inferred. See Eyal, 411 Mass. at 429-31; ELM Medical, 403 Mass. at 785. See also Leddy v. Narragansett Television, L.P., 843 A.2d 481, 488-89, 490-91 (R.I. 2004) (giving effect to disclaimers contained in television broadcast and noting that, particularly where matters of public concern are involved, "it is not our place to serve as the censors of journalistic discretion"). Thus, this Court should dismiss plaintiff's libel-by-juxtaposition claim, as other courts have done in cases where the alleged defamation cannot be said to be "of or concerning" the plaintiff. See, e.g., Church of Scientology v. Flynn, 578 F. Supp. 266, 269 (D. Mass. 1984); Godbout v. Cousens, 396 Mass. 254, 264 (1985).

At its essence, plaintiff's argument is a flawed syllogism: *The article says teenagers are promiscuous; plaintiff is a teenager and is pictured next to the article; therefore the article says that plaintiff is promiscuous.* The argument is erroneous because, first, the article does not purport to say that all teenagers engage in exactly the same behaviors. While the article identifies some trends, it also points out that different teenagers have very different degrees of sexual experience. Some say they "hook up" regularly (Ex. A, at 120); others do not, but say they feel pressure from friends to do so (Ex. A, at 121); still others "'lie and say they've done it'" (Ex. A, at 121); one offers her opinion that "everybody's having casual sex and ... everybody is a ho" (Ex. A, at 123, 171); and another appears to have forsworn any relationships until college, when – she hopes – "guys will start to wise up" (Ex. A, at 171). The article is peppered with words like "some," "most," and "many." It does not purport to say that all teens are sexually

13

experienced or active, and therefore it cannot be said to ascribe any one or more characteristics to "all teenagers," or even any separably identifiable group of them.

Moreover, even if the first premise – that the article tars all teenagers with a single brush – could be accepted, the established law of group libel would preclude the conclusion that plaintiff has thereby been defamed. "Where ... an individual claim is based on alleged group defamation 'an individual member of the defamed class cannot recover for defamation unless "the group or class is so small that the matter can reasonably be understood to refer to the member, or . . . the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member."'" Operation Rescue Nat'l v. United States, 975 F. Supp. 92 (D. Mass. 1997), aff'd, 147 F.3d 68 (1st Cir. 1998), quoting Eyal, 411 Mass. at 430 n.6, and Restatement (2d) of Torts, § 564A. Clearly the "group or class" of "teenagers" is too large to support a claim that all of them are defamed by a pejorative reference to teens generally.[8] And plaintiff has pointed to nothing in the Metro Corp. publication that suggests that any particular comment in the article is intended to refer to her, or reasonably would be so understood – indeed, the disclaimer specifically states otherwise.[9]

---

[8] Thus, plaintiff cannot claim to be libeled based on the sub-headline suggesting merely that "your kids ... might know more about sex than you do" and stating generally, "They hook up online. They hook up in real life." (Ex. A, at 119.) See Operation Rescue, 975 F. Supp. at 100 (dismissing claim that individual members of organization were defamed by politician's statement that "we have a national organization like Operation Rescue that has as a matter of national policy firebombing and even murder," on the grounds that there are too many members for the statement to be deemed as defamation of each one). If one were to restrict the "group or class" to "today's eastern Massachusetts teens" (Ex. A, at 120), plaintiff's claim would be excluded, because she resides in New Hampshire. Presumably plaintiff would wish to define the "group or class" instead as those students depicted in the photo essay – but such a conclusion would not be reasonable, and therefore is foreclosed, because of the disclaimer that expressly states that "the individuals pictured are unrelated to the people or events described in this story." (Ex. A, at 119.)

[9] To the contrary, plaintiff has pointed out at least one reference that would tend to *disassociate* her from the article. She notes in the Amended Complaint (¶ 11) that the magazine's cover includes a headline, "Fast Times at Silver Lake High: Teen Sex in the Suburbs." It is difficult to imagine that anyone who knows plaintiff well enough to recognize her photograph in *Boston* magazine would associate her with Silver Lake Regional High School, in Kingston, Massachusetts (on the state's South Shore), rather than

It is in that way that this case differs most substantially from the flagship "libel-by-juxtaposition" case under Massachusetts law: Mabardi v. Boston Herald, 347 Mass. 411, 412 (1965). That suit arose out of newspaper coverage involving the so-called "Blatnik Committee," which was investigating fraud and criminal manipulations of state and federal government payments. The newspaper had already reported on "several attorneys and laymen" who had been criminally convicted after appearing before the committee. Mabardi, an attorney, appeared before the committee and received its "thanks" for *refusing* to take part in such fraud. The next day, the newspaper published his photograph, with his name in the caption, beneath a banner front-page headline: "Settlement Upped $2,000 -- $400 Kickback Told." Next to Mabardi's photograph was the photo of a state negotiator who, according to the accompanying article, had recently been convicted of taking a $400 kickback. There was no reference to Mabardi in the article, and no explanation in the newspaper as to why he was pictured. 347 Mass. at 411-12.

Under those circumstances, the Supreme Judicial Court held that the photograph was capable of defaming attorney Mabardi, and so denied the defendant's demurrer. The court relied heavily on the facts that Mabardi's picture was juxtaposed with that of a convicted felon, beneath a headline about an illegal kickback, and that the defamatory inference "was not discouraged by any clarifying textual reference to the plaintiff." 347 Mass. at 413-14. See also Morrell v. Forbes, Inc., 603 F. Supp. 1305 (D. Mass. 1985) (declining to dismiss juxtaposition claim where article on organized crime's extensive domination of New York City's Fulton Fish Market was juxtaposed with a photograph of plaintiff fisherman with a caption containing the defamatory innuendo, "The Boston Fish Pier: smaller fry in a *fishy business*" (emphasis added), and where only other photograph of a recognizable person was of "fish market mobster Socks Lanza").

---

with Manchester Central High School, in her home town located 90 miles away in New Hampshire. (See Am. Complaint, ¶¶ 1, 11; Ex. A, at 120.)

Plaintiff's claim before this Court stands on far, far weaker footing. Plaintiff alleges nothing to suggest that defendant made any specific defamatory statement in the article's headline that would refer to her,[10] or that it "encouraged" any defamatory implication by the way it arranged the photographs, or that it included a caption suggesting defamatory activity by the plaintiff, or that the other photographs in the essay carried a defamatory message. To the contrary, Metro Corp. employed graphic techniques to separate the photo essay from the article (see pages 3-4, supra); did not publish plaintiff's name anywhere; and published next to plaintiff's photograph a disclaimer that was exactly the sort of "clarifying textual reference" that the Mabardi case was lacking.

### C.    Plaintiff's Libel-by-Juxtaposition Claim Fails Because the Defendant Was Not Negligent.

As a matter of law, plaintiff cannot show, as she must to prevail in this action, that Metro Corp. "acted with negligent disregard for the truth" by juxtaposing the photograph and article. See Brown v. Hearst Corp., 962 F. Supp. 622, 627 (D. Mass. 1994), aff'd, 54 F.3d 21, 26 (1st Cir. 1995); Ricci v. Venture Magazine Inc., 574 F. Supp. 1563, 1571 (D. Mass. 1983). On such grounds, the First Circuit Court of Appeals has upheld dismissal of a libel-by-juxtaposition claim, holding that even if the broadcast at issue included "gratuitous" matters and was "gaudy journalism," nonetheless the plaintiff identified "no significant inaccuracies" nor any "counterbalancing evidence" that was not included. Brown, 54 F.3d at 26. Similarly here, plaintiff does not allege any "specific negligent act" by Metro Corp. in the preparation or production of the article.   To the contrary, the magazine specifically took care to explain to readers, in the disclaimer adjacent to the photograph, that the individuals in the photos were not related to the persons or events described in the article. (Ex. A, at 119.) If plaintiff's assertion is

---

[10] The sub-headline stating that "your kids … *might* know more about sex than you do" (emphasis added) does not allege any defamatory fact. See II.D, infra.

that the magazine should have interviewed every student depicted in the photo essay and disclosed what sexual activities described in the article in which they had or had not engaged, then the assertion amounts to a dictate that the magazine not report on this issue of public concern. "To hold a publication liable on these facts would be to demand a standard of such meticulous care as would induce undue self-censorship by the news media." <u>Cefalu v. Globe Newspaper Co.</u>, 8 Mass. App. Ct. 71, 77 (1979) (affirming summary judgment dismissing claims of plaintiff interpreter who alleged defamation based on photograph showing him standing in line at unemployment office).

### D.     Plaintiff's Libel-by-Juxtaposition Claim Fails Because Plaintiff Has Not Alleged That Defendant Made a False Statement of Fact.

A private figure plaintiff suing a media defendant for statements involving matters of public concern must allege and prove falsity. <u>Yohe</u>, 321 F.3d at 40, <u>citing</u> <u>Dulgarian</u>, 420 Mass. at 847. Plaintiff fails specifically to allege what it is about the publication that is false, other than a vague, blanket averral that the "matters" published were false (Am. Complaint, ¶ 18). To the extent that she stakes her claim on the suggestion in the subheadline that "your kids … might know more about sex than you do," the claim must fail because such a statement is speculation that is not "provably false." <u>See</u> <u>Brown</u>, 862 F. Supp. at 629; <u>Veilleux</u>, 206 F.3d at 108. More fundamentally, however, there is no falsity because the disclaimer, located adjacent to plaintiff's photograph, clearly disavows any specific connection between the plaintiff and the activity described in the article. (Ex. A, at 119.)

### E.     Plaintiff's Libel-by-Endorsement Claim Also Fails to State a Cause of Action Upon Which Relief Can Be Granted.

In addition to her claim based on the juxtaposition of photograph and text, plaintiff alleges she was defamed by the disclaimer's supposed insinuation that she was "the subject of a five year project on teen sexuality." (Am. Complaint, ¶ 17.) The actual wording of the

disclaimer, however, is otherwise:  It says only that the photograph, in which plaintiff appears, is "from an award-winning five-year project on teen sexuality by photojournalist Dan Habib."  (Ex. A, at 119.)  That statement is incontestably true, and since the photograph of plaintiff appeared as part of Habib's photo essay posted on the internet, Metro Corp. cannot in any event be deemed negligent for saying so.  See Ex. B hereto; see also note 2, supra.  Whether or not plaintiff gave her authorization for the photograph's publication is not relevant to her libel or false light invasion of privacy claim.  See Tropeano, 379 Mass. at 751 (dismissing libel by juxtaposition claim on a Rule 12(b)(6) motion, despite plaintiff's allegation that she did not authorize publication of her photograph with article on modern sexual mores).

Even if one accepts plaintiff's characterization that the disclaimer suggests she had been a "subject" of a photographic project on teen sexuality, such a statement cannot be said to "hold the plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair [her] standing in the community, at least to [her] discredit in the minds of a considerable and respectable class in the community."  Yohe, 321 F.3d at 39, quoting Tartaglia, 19 Mass. App. Ct. at 696.  To say that the plaintiff had her picture taken for a photo essay, even on a topic that she finds uncomfortable, does not diminish her reputation in a respectable segment of the community.  That is especially true since any reader of the disclaimer will also see the products of the photo essay published in the magazine, and can see there was nothing sexually explicit about them.  (Ex. A, at 118-123.)

**III.    The Amended Complaint Fails to State a Claim for Invasion of Privacy.**

Plaintiff's claim for "statutory invasion of privacy" pursuant to Mass. Gen. Laws c. 214, § 1B, as a result of the alleged portrayal of her "in a false light" must be dismissed because the tort of false light invasion of privacy is not recognized in Massachusetts.  Even if it were, plaintiff's claim could not proceed because the publication of her photograph in this context was

18

not false, was not undertaken with reckless disregard of the truth, and did not describe her in a way that would be "highly offensive to a reasonable person."[11]

### A.    Massachusetts Does Not Recognize a Claim for False Light Invasion of Privacy.

As this Court recently ruled, "The tort of false light is not recognized in Massachusetts." Albright, slip op. at 19, citing ELM Medical, 403 Mass. at 787. See also Dasey v. Anderson, 304 F.3d 148, 154 (1st Cir. 2002); Brown, 54 F.3d at 27. Therefore, plaintiff's claim for false light invasion of privacy must be dismissed.[12]

### B.    Plaintiff Fails to Allege the Required Elements for a False Light Invasion of Privacy Claim.

Even if this case were an appropriate one for this Court to make new Massachusetts law, plaintiff's false light claim would have to fail. In its standard formulation, the tort of false light invasion of privacy exists where (a) someone is put in a false light that would be "highly offensive to a reasonable person," and (b) the publisher "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Howard v. Antilla, 294 F.3d 244, 248 (1st Cir. 2002), quoting Restatement (2d) of Torts, § 652E. The tort thus requires proof that the defendant published the challenged matter with knowledge of its falsity or reckless disregard for whether it was false. Veilleux, 206 F.3d at

---

[11] To the extent that plaintiff is asserting a further invasion of privacy claim pursuant to Mass. Gen. Laws c. 214, §1B, the claim should be rejected. Plaintiff's claim "sounds in defamation, not invasion of privacy, because [she] objects to the making of a false statement, not the revelation of private information." Albright, slip op. at 19-20, citing Riley v. Harr, 292 F.3d 282, 298 (1st Cir. 2002). In any event, plaintiff cannot make the required showing of an invasion of her privacy that was both "unreasonable" and "substantial or serious." See Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. 514, 517-18 (1991).

[12] As both the First Circuit and this Court have held, a diversity case is not the proper arena in which to thrust a new cause of action into the state law jurisprudence. See Dayton v. Peck, Stow and Wilcox Co., 739 F.2d 690, 694 (1st Cir. 1984) ("We must apply the law of the forum as we infer it presently, not as it might come to be"); Brown, 862 F. Supp. at 631 (holding that federal district court "should not be the first to recognize a state cause of action, especially where there are alternative theories").

107-108. The requirement of "actual malice" applies even where the plaintiff is a non-public figure. See Veilleux, 206 F.3d at 108-109.

Plaintiff has not, and cannot, allege that *Boston* magazine published the photograph with knowledge or reckless disregard of its falsity. Such an allegation would fail because the magazine specifically disclaimed any false inference that could be drawn from its publication. See II.C, supra. She also cannot show that the publication of her photograph next to the article is "highly offensive," as required to state a false light claim.

Moreover, even if Massachusetts were to recognize the false light tort, it would be subject to the same additional constitutional limitations that apply to a defamation claim. See Howard, 294 F.3d at 248-49; Veilleux, 206 F.3d at 109. .Thus, plaintiff's false light claim could not in any event succeed because, as demonstrated above, the plaintiff cannot allege and prove that the publication was materially false, see II.D., supra; Howard, 294 F.3d at 256, or that it was "of and concerning" the plaintiff, see II.B, supra; Emerito Estrada Rivera-Isuzu de P.R., Inc.v. Consumers Union, 233 F.3d 24, 26-30 (1st Cir. 2000) (discussing whether "of and concerning" requirement is constitutionally required).

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Amended Complaint against Metro Corp. in its entirety, with prejudice.

Respectfully submitted,

METRO CORP.
By its attorneys,

Robert A. Bertsche (BBO #554333)
David E. Plotkin (BBO #644858)
PRINCE, LOBEL, GLOVSKY & TYE LLP
585 Commercial St.
Boston, MA 02109
(617) 456-8018
(617) 456-8100 (fax)

Dated: June 6, 2004

<u>Certificate of Service</u>

I, Robert A. Bertsche, attorney for the defendant, hereby certify under the penalties of perjury that on June 6, 2004, I served the foregoing Defendant's Memorandum in Support of its Motion to Dismiss on plaintiff by transmitting a copy thereof by first class mail to her attorney, John Donohue, Fuller, Rosenberg, Palmer & Beliveau, 340 Main Street, Suite 817, Worcester, MA 02608.

Robert A. Bertsche

# Exhibit A

They hook up online. They hook up in real life. With prom season looming, meet your kids—they might know more about sex than you do.

# The Mating Habits of the Suburban High School Teenager

### By Alexandra Hall
#### Photo essay by DAN HABIB

FOUR SOUTH SHORE TEENAGERS ARE packed into a new, parentally subsidized, white compact car, which is driving too fast down Route 53. They have plenty of gas, no homework, and a whole night to kill. The only problem is, they have no idea where they're going. It's vacation week, most of the popular kids from their high school are away on family vacations, and the social void left in that wake hangs over the speeding car like a humbling bad-hair day. ¶ "There's never anything to do around here," complains Nicole, a pretty Keri Russell–look-alike riding shotgun and wearing a hooded Abercrombie & Fitch shirt. A chorus

*The photos on these pages are from an award-winning five-part project on teen sexuality by photojournalist Dan Habib. The individuals pictured are unrelated to the people or events described in this story. The names of the teenagers interviewed for the story have been changed.*



BOSTON · MAY 2003    119

They hook up online. They hook up in real life. With prom season looming, meet your kids—they might know more about sex than you do.

# The Mating Habits of the Suburban High School Teenager

**F**OUR SOUTH SHORE TEENAGERS ARE packed into a new, parentally subsidized, white compact car, which is driving too fast down Route 53. They have plenty of gas, no homework, and a whole night to kill. The only problem is, they have no idea where they're going. It's vacation week, most of the popular kids from their high school are away on family vacations, and the social void left in that wake hangs over the speeding car like a humbling bad-hair day. ¶ "There's never anything to do around here," complains Nicole, a pretty Keri Russell–look-alike riding shotgun and wearing a hooded Abercrombie & Fitch shirt. A chorus ❱❱❱

*The photos on these pages are from an award-winning five-year project on teen sexuality by photojournalist Dan Habib. The individuals pictured are unrelated to the people or events described in this story. The names of the teenagers interviewed for the story have been changed.*

## By Alexandra Hall
Photo essay by DAN HABIB

**[The Mating Habits of the
Suburban High School Teenager]**

of amens (one "No shit" followed by a "Yeah, and it sucks") rises from the back seat. Thus bolstered, she goes on. "I mean, you know, tonight is, like, way worse and all that because there's *really* nothing to do. But there's never anything good or any fun. It's just like . . . uchh." She expels a sound that's half ennui, half disgust. "All we ever do is go hang out and get drunk, like, *all* the time, and, you know, hook up."

Hook up with whom? Boyfriends and girlfriends? "Not really . . ." she says, hesitating at first and turning to her peers for backup. "It's all pretty random. We just get together in small groups of kids and drink a lot and then hook up with whoever." Christine, a curly-haired pixie in the under-90 weight range, chimes in. "Sometimes we'll hook up for two or three months at a time with one person. But no one really ever goes steady. Dating is just really uncommon. No one wants that kind of responsibility, you know? Most of us just go out and get drunk and whatever—hook up at someone's house."

"Like the time I hooked up with Ryan," offers Christine. This earns her a wrinkle-nosed grin and a nod from Nicole. "Hey, I have to give you a big pat on the back if you hooked up with him," she says. "Because he is *so* hot."

As euphemisms go, "hooking up" is loaded and vague—not to mention ubiquitous. To the kids who use it, it can mean anything from sexual intercourse or oral sex to serious touching or just kissing. "No one I know considers oral sex to be sex at all," says Rob, a senior at an area private school who joins up with us later, after we crowd into a booth at a local restaurant for a snack. Dark-haired, clean-cut, and with high cheekbones, Rob looks the very picture of sweet innocence. "Oral sex just isn't what sex means," he says definitively, sounding distinctly reminiscent of Bill Clinton. "But I guess it's what hooking up can mean."

So what does Christine mean by it? "Oh, we didn't have sex," she says, shaking her brown curls slowly to add drama. "But we did come close. You know . . . ," she trails off deliberately. "Anyway, I don't think I could have sex with other people there."

"Like those two freshmen at the New Year's party that we walked in on?" asks Rob. "Remember that? They were totally going at it on the day bed, and we just walked in and they didn't care." He starts laughing. "And, meanwhile, this other girl was in the room, just using the phone, like, 5 feet away from them. Talking like they weren't even there. She didn't care at all. She was just, like, 'Whatever.'"

**AH, ADOLESCENCE.** In every decade, it's always been as much about raging hormones as it is about personal discovery. But make no mistake about it: Things today are very, very different in high school from the way they used to be. Not different from two or three generations ago, but different from just 5 or 10 years ago. Kids may not be telling their parents so, but among their peers they are unflinchingly plain about it: Oral sex is the new second base. When it comes to sexual experimentation, high school is the new college. The prom, which will bring self-consciously attired teenagers to function rooms and high school gyms all around Boston and its suburbs this month, is no longer even remotely the traditional night of sweet discovery or coming of age. And sex, says Monica, a quiet-spoken 17-year-old student in East Boston, is the new kissing: "People just assume you do it, because most everybody is."

Parents across Massachusetts were shocked last year when police uncovered a sex scavenger hunt at Newton South High School—including a list of sex acts to perform for points—and when oral sex was reported between a 15-year-old girl and a 16-year-old boy on a Silver Lake Regional school bus. Kids, however, were not. "We thought it was funny that they got caught," says Jessica, a cute, lively, blond 17-year-old senior. "But nobody was surprised. I mean, I've been on buses when people have hooked up bigtime. And I've heard of boys asking girls to touch them or whatever and people doing it on buses and at school."

Recent studies about teen sexuality and months of interviews with students from eight Boston-area high schools suggest that



today's eastern Massachusetts teens are both sexually advanced (blame the Internet) and sexually daring. And most aren't afraid to go out and try what they're curious about—or put serious pressure on their peers to give it to them. According to the Centers for Disease Control (CDC), 46 percent of Massachusetts high school boys say they have engaged in sexual intercourse. Columbia University's National Center for Addiction and Substance Abuse says that number is on a par with the national figure, up from about 20 percent in the early 1970s. The same study shows that the percentage of 15-year-old girls having intercourse has skyrocketed from 5 percent to 38 percent nationally. The CDC says the number of Massachusetts high school girls having sex is even higher, at 42 percent.

With this increase in sexual activity has come a profound shift in the culture of high school dating and sex, with no-strings "hooking up"—and Internet porn and online cybersex—often replacing dating. "We talk dirty to each other a lot," says Rob, who is 18. "It definitely goes beyond just asking, 'What are you wearing?' It's a lot of R-rated flirting, and I definitely know kids who have had cybersex."

Jessica agrees. "Relationships are a lot of responsibility," she says. "Lots of kids think hookups and online stuff is just easier."

The very terminology kids use is their way of pushing off not only responsibility, but fear, says Lynn Ponton, a professor of clinical psychiatry at the University of California at San Francisco and author of *The Sex Lives of Teenagers: Revealing the Secret World of Adolescent Boys and Girls.*

"Just look at what words teens use to describe sex," says Ponton. "Today, it's 'hooking up,' which is a casual term that [teens] use to make sex less frightening. If it's just 'hooking up,' it doesn't have the same fear going along with it."

TEENAGE SEX IS obviously not a new phenomenon. But 20 years ago, not only was it much less pervasive, it also had a different context. That context was called dating. Typically it went like this: Boy drives up to girl's house, rings doorbell, meets girl's parents, drives off to movies and/or dinner with girl. Sex was something that happened only after a boy and girl had "gone steady" for a while. These days, something else is much

album, *Stripped*. Take your pick of any of the sexual music videos that highlight bodies (usually girls') in various states of undress. And while blaming only one of these causes may be too simplistic, the impact of each is significant. Add it up, say kids, and what you've got is intense pressure coming from seemingly every direction to be sexually active.

"There's definitely a lot of pressure at school to have sex," says Rebecca, a tall, carefully groomed Roslindale senior with dark eyes. "A lot of people lie and say they've done it. You see these girls on TV in a [music] video, and they're perfect. And you think you have to be like that even if you can't be. And you see them half-naked on TV and in magazine ads, and they're with a guy



more common: Single boys and girls with nothing to do go in a group to a friend's house (where the parents may or may not be home), drink or smoke pot, then pair off and engage in no-strings "hookups." A week later, when the same scenario happens again, they hook up with someone else.

Don't believe it? Michael Milburn, a professor of psychology at the University of Massachusetts Boston and coauthor of the book *Sexual Intelligence*, says the days of a boy showing up at a girl's front door and meeting her parents before he takes her on a date are almost obsolete. "Dating has been replaced by house parties and a culture of 'hooking up,'" says Milburn. The reason? Simple, he says: "Kids today are raised in a hypersexual culture where they're told every day that sex will make them happy."

What is less simple is identifying the cause of this dramatic shift. Perhaps it's the intense sexualization of teen culture of recent years. But what has caused *that*? It's tempting to blame the Abercrombie & Fitch catalogs so popular with teens (spotlighting scantily clad adolescent models of both genders), the aforementioned Bill Clinton, or the highly sexual marketing of today's teen pop idols. In the 1980s, Madonna's relatively tame "Like a Virgin" and George Michael's "I Want Your Sex" (even when accompanied by a video urging viewers to "Explore Monogamy") were considered shocking. Now there are dramatically more suggestive images, lyrics, and videos: from Britney Spears singing about her virginity (or lack thereof) and doing a striptease on MTV, to an equally undressed Christina Aguilera singing "Dirrty" on her new

with his hand on her butt, and it's all sex, all the time, all around you. And you think, maybe that's what I should be doing. And your friends see the same thing and say the same thing, and they ask you all the time if you're having sex or not."

Such pressure may seem like enough to send teens screaming to embrace the widely publicized abstinence movement, but so far that hasn't happened—in spite of stepped-up efforts by abstinence backers. Last year, the Bush administration sought an 83 percent increase in federal spending on an abstinence education grant program, bringing the annual total for abstinence-

> "Nobody's very concerned about AIDS. We don't really see many STDs around here. Kids think it's just something that their parents made up to keep us from having sex."

only education to $135 million and sparking debate over whether the money would be better spent on teaching kids about having responsible, protected sex. The abstinence-only program bars classroom teachers who use the money from discussing contraception—that is, other than stressing that condoms are not 100 percent effective in preventing pregnancy or the spread of sexually transmitted diseases (STDs). At the moment, 49

states including Massachusetts use federal funds for education programs that discourage sexual activity outside of marriage.

Instead of encouraging kids to resist the pressure to have sex, the abstinence movement seems to be causing a backlash. Evidence that any of the movement's efforts are actually keeping teens from having sex—or protecting themselves when they do have it—is minimal at best. In 2001, the National Campaign to Prevent Teen Pregnancy said it had found no conclusive evidence showing an impact by the abstinence movement on how much sex teenagers were having. In one town in upstate New York, 13 girls, some as young as 14, were infected with the HIV virus after having sexual relations with the same man in 1997. And in suburban Rockland County, Georgia, more than 200 teens, some as young as 12, were exposed to syphilis in 1996 by swapping partners for casual sex. In Massachusetts, 43 percent of high school students admit they didn't use a condom the last time they had sexual intercourse, according to the Centers for Disease Control.

"Most people just do it to do it," says Nicole. "The abstinence

> "Teens get most of their sex 'education' from the Internet," says Richard Davis, an expert on Internet use. That "increases the sexual repertoire of young people, exposing them to extreme sexual behaviors."

Many area teens get birth control at local clinics. "I went to one with a friend once and we saw like seven girls I knew," says Christine, who visits a clinic near her home in Hull. "But I just heard about it from friends, not through school." In fact, when asked, many kids give their in-school sex education low marks. "I had it in seventh grade, and not since then," says Jessica. "They talked a lot about HIV but didn't tell us much about birth control at all. They showed us a couple of videos about rape and nothing about sexual harassment—I learned about that from my mom," she says. "Overall, the class was pretty weak."

**WHEN REAL SEX EDUCATION** isn't available or sufficient, teens overwhelmingly turn to one source: their computers. "Teens now get most of their sex 'education' from the Internet," says Richard Davis, a Boston University–trained psychologist who specializes in Internet behavior and founded the Web site InternetAddiction.ca. "Some of that information is great, but the Internet also increases the sexual repertoire of young people, exposing them to extreme sexual behaviors like rape or animal sex or child pornography. The problem is, kids don't understand the ramifications of different sexual activities. It's like exposing a young child to swear words, and the child goes around using the words without knowing exactly what they mean."

One of the biggest casualties of the Internet sex education phenomenon is accurate information. In the case of birth control, kids who say they use it appear to be doing so primarily to prevent pregnancy, without much concern for disease. "Lots of girls use pills, and sometimes boys use condoms," says Christine. "But it's mostly pills. Nobody's very concerned about AIDS. We



movement just makes us want to do it more. Plus, there's a lot of pressure to do it. If you're together for more than a month, everyone starts asking you if you've done it yet."

Many teens consider abstinence a moot point. "Most of my friends think it's stupid," says Jordie, an outspoken 18-year-old student at the Snowden International School in Boston. "You know, you see an ad on TV for abstinence and ignore it. They see this person telling them not to have sex, and they've already had sex a long time ago. So they say, 'I've already done it, so abstinence has nothing to do with me.'"

don't really see many STDs around here. Kids think it's just something that they [parents] made up to keep us from having sex."

There seems to be an equal amount of misunderstanding about whether STDs can be passed through oral sex. "I never worry about that. No one even considers that real sex. But everyone's concerned with pregnancy. So am I," says Rob.

"Herpes is worse than AIDS," says Jessica, a junior at Boston Latin School.

"No way. I'd rather be pregnant than have AIDS," pipes in her friend Michelle. "That's why so many people use condoms."

Asked if they have—or know anyone who has—found that a condom wasn't handy during foreplay and had sex anyway, they nod yes. "So many people are on the pill. And they worry about having kids much more than about diseases," Jessica explains.

In some cases, neither issue appears to be a concern. "If you see a girl and you think she's hot," says Jordie, "and your friends say, 'Don't mess with her, she's got VD,' chances are you'll probably mess with her anyway. Because why not?"

The more crucial question may be, in the face of all the dangers, *why*. "Teens feel more and more isolated," says Milburn. "And sex is a way to form a connection, a way to self-medicate their pain and stress and insecurities and isolation, much in the same way people use drugs, alcohol, or food."

If the way teens are using sex is akin to drugs, then the failure of Nancy Reagan's "Just Say No" campaign may be the most apt analogy for the general failure of the abstinence movement. In fact, more often than not, sex and alcohol and/or drugs go hand in hand. "The main drugs are alcohol and pot," says Rob. "Sometimes prep-school kids do ecstasy, mushrooms, coke—coke is actually getting more popular right now. Kids don't see it as dangerous even though they've seen some of their friends ruined by it. I guess it's sort of a responsibility thing. We just don't want any, you know? As you get older, you have more freedom. You have a car and a part-time job. You want to escape from all that."

**YEARS AGO, COLLEGE** was the place for sexual experimentation. Now it's high school. One of the many reasons for that may be that girls have changed their attitudes toward monogamy. Naomi Ninneman, manager of adult education at



the local Planned Parenthood, oversees an education program that counsels 1,500 teens per month about relationships and sex. She says she often hears girls saying they have lost their faith in relationships.

"We hear stuff about mistrust a lot," she says. "When we ask questions like, 'How do you build trust in a relationship?' we often hear girls say, 'You don't.' Many girls still want relationships, but feel like it's a lost cause."

Their complaints may be increasingly valid. If the numbers are any indication, teenage boys are exhibiting more sexual aggression than ever. Over the last two years, a rash of teen arrests in Braintree, Canton, Kingston, and Winthrop in connection with alleged assaults and rapes left dumbfounded parents and school administrators searching for answers: Why are these boys becoming more sexually aggressive? Why are these rapes happening in Massachusetts?

"There seem to be isolated pockets across the country where we're seeing more cases of [teen rape], and New England is where it seems to be happening right now," says Lynn Ponton, the psychiatry professor. "But it's surprising to me that people are so shocked when these things happen. The media and the Internet continually feed teenage boys the idea that girls are sexual objects at their disposal. It's gotten significantly worse in the last 5 and 10 years. The degradation of women is everywhere, it's glorified, and then we're surprised when teens act that out?"

Most of the local rapes involved older boys and younger girls, which doesn't surprise students from local schools, who describe a culture in which senior boys routinely proposition younger girls at weekend parties and even in the halls at school.

"At Hingham High, there's a core group of jocks who go way out of their way to hook up with freshman and sophomore girls, because they know it's easy ass," Rob says nonchalantly. Christine, who was sexually abused last year when she passed out drunk after a party, is noticeably less at ease with the subject, but agrees. "They're mean to anyone who isn't rail thin and super attractive. And even if you are, once they've used you for sex or oral sex, they're mean to you anyway. They walk right up to you in the hall and grab you and say gross things to you. And they think that's okay. And it's like, *Hello?* What a turnoff."

Ponton says a majority of girls under 16 report that their first sexual experience was forced. "For young girls, sexual intercourse, whether it's forced or not, feels like an invasion," she says. "When you combine that with the actual increase in violence and aggression of teen boys, it's a very serious situation."

For some girls, it's a matter of privacy and betrayed trust. "I would never seriously date anyone from my school again," says Nicole. "Because once you do, your boy will tell everybody your business about what you're doing with him sexually. And in that way, you have no privacy. It's like I'm dating the whole school."

Backing off from monogamous relationships, some girls say, has given them a greater sense of control. "If I want to hook up with someone, I will," says Monica. "It's not fair that I should be too scared to because they, like, might call me a slut or whatever. It's my decision."

Carl Wilson of the Washington, DC–based Coalition for Positive Sexuality, a self-described "guerrilla sex-education" group, says girls can be more openly sexual today than 20 years ago. "We're seeing more girls having sex without dating, and I think that's a way to fight the whole 'bitches' and 'whores' thing that's been used to disempower women sexually," Wilson says. "Part of [the coalition's] message to girls and teens is, 'You have the right to have the sex you want, and the right to not have the sex you don't want.'"

Commenting on the age-old double standard, Rebecca lays that philosophy out even more bluntly. "Once a girl does it with more than one guy, she's a 'ho,'" she says, using popular-culture shorthand for whore. "But these days, when you think about it, everyone is a ho. Because if a dude is messing around, he's considered a player and he gets all kinds of [Continued on page 171]

**Teen Sex** [Continued from page 123]

high-fives. But if a girl plays, then she's a ho. But the truth is, everybody's having casual sex and pretty much everybody's doing it with multiple partners. So, really, everybody is a ho."

**E**VEN WITH THIS EXPONENTIAL increase in high school sexual experimentation, one thing is clear: Parents—and these are largely parents who were products of the sexual revolution—are overwhelmingly clueless about their kids' sexual experiences and knowledge. Most teens interviewed for this story said their parents have no idea what their real sex lives are like, and that they get much of their own sex education online.

"The problem is that most parents don't have a model of how to talk to their kids in a meaningful way about sex," says Milburn. "Parents often have a lot of their own guilt and shame around sex, and that keeps them from talking to their kids in an honest way."

To combat this, Planned Parenthood's Ninneman suggests that parents use situation-based examples to jump-start conversation with their kids. "We often tell parents to use a news piece or a movie to bring up the topic," Ninneman says. "If you see people on TV talking about sex, ask your kid what they think about it. It helps ease the tension and makes it easier for both of you." What's more, advises Milburn, that conversation should go beyond just the biological basics. It should, he says, "also emphasize values relevant to sexual decision-making, and the emotional components of sexuality."

The emotional components of sexuality may be a foreign concept to many teenagers, who have shunned the complicated world of relationships for quick and emotionally distant sex. On the other hand, frightened or not, there are those who say they're holding out hope for the future.

Back in that South Shore restaurant booth—between complaints about the lack of anything to do and gossip about upcoming graduation parties—Jessica pipes up. "A lot of girls I know *do* want relationships. But for me, not if it means being treated like shit. I'd rather be alone than that," she says, slurping up the last bit of Coke out of an ice-filled glass and pulling on her windbreaker. "In college, it seems like guys will start to wise up about relationships. I guess we'll see." **B**





# Exhibit B

# TEEN SEXUALITY
## *in a culture of confusion*


## INTRODUCTION
*a look at the issues*


## OVERVIEW
*love, lies and fantasy: a cultural analysis by Susan Bordo*


## PROFILES
*eight teens tell the stories of their sexuality*


## CULTURAL CONTEXT
*scholars examine mass media, gender, the body and beauty*

| INFORMATIONAL RESOURCES | QUESTIONS FOR DISCUSSION | ABOUT DAN HABIB |
| --- | --- | --- |

INTRODUCTION // OVERVIEW // PROFILES // CULTURAL CONTEXT // RESOURCES // QUESTIONS FOR DISCUSSION // // ABOUT DAN HABIB //

// THE PHOTOJOURNALIST'S COFFEE HOUSE //

To inquire about this project
in video, and printed formats,
send an email to project creator Dan Habib.

All photos ©2002, Dan Habib, Impact Visuals



# TEEN SEXUALITY
## in a culture of confusion

## LOVE LIES AND FANTASY:
### a cultural analysis

By SUSAN BORDO

Sexuality is the most profound meeting place of nature and culture. At its best, sexuality allows us to give ourselves over to feeling, to other people, to the world, to say yes to ourselves and to our bodies. But sexuality is also where we experience most intensely the demands of religion, morality, and culture in general.

Popular culture, I would insist, has a profound influence on teenagers' sexuality. That's where they get their ideas about what is attractive, what's feminine, what's masculine, what's cool, what's sexy, what's romantic. Melrose Place is not just a soap opera; it's an instruction in how to be. And images of sexuality play a large part in that instruction. People may respond to these images in different ways, but noone exists outside them, in a bubble of cultural immunity. We are all--parents, peer groups, rick, poor, black, white--inhabitants of this culture.

Parents and church may provide verbal instruction and prohibition--but we need to realize that people no longer learn primarily through verbal instruction in this culture, but through pictures and images , which get directly at fantasy and desire, and feed the hunger for stimulation and excitement.

// BACK // INDEX // NEXT //

To inquire about this project



# TEEN SEXUALITY
## in a culture of confusion

Cultural images are all the more powerful because they are not arbitrary inventions of the media. They reflect the changing times they emerge out of. Fashion designers and ad agencies and program developers invest a great deal of money in sniffing out cultural currents, in figuring out what will appeal to people of various groups. The images that they come up with don't just imprint themselves on us as though we were blank slates ready to be manipulated. No, these images are created to feed into powerful feelings that already exist. Insecurities. Fears. And Fantasies.

When I was growing up, explicit depictions of the sex act were only available to adults who went out of their way to go to a porno store or an X-rated movie. We are now living in a culture that puts these things in the homes of every family. Television is a 24 hour a day operation, churning out highly sexualized images of women's bodies (and increasingly, men's bodies too), images of sexual ecstasy, plots involving sexual pursuit, danger, and violence.

Sex is so pervasive and it's presented as such an essential part of being an attractive human being with an exciting and fulfilling life that if you reject sex, you become the ultimate outsider.

Sex is no longer seen as something that the wild kids or the cool kids do. It has become a rite of passage whereby a teenager not only becomes a sexual person but becomes a full-fledged member of our culture.

// BACK // INDEX // NEXT //

# T E E N   S E X U A L I T Y
## in a culture of confusion



Our culture continues to romanticize promiscuity even as it pays lip service to monogamy and abstinence.

In movies, music videos, and soap operas, romantic encounters are still continually presented as sexually irresistible moments of intense combustion between two people, who couldn't care less about condoms or each other's sexual histories.

So, it makes perfect sense to me that teenagers would see casual sex as a way to have excitement and romance in their lives. And of course what's really dangerous about this is that in this era of AIDS, you need to be able to say "Whoa, yes, I really am attracted to this person, I really want to be with this person, but I better be a little cautious about it." All these images are saying exactly the opposite - that the only way you can find sexual bliss is to lose your mind, to abandon control.

So, on the one hand, popular culture provides images and music which heighten desire and excite fantasy. But the culture also creates obstacles to that desire unfolding in a spontaneous and pleasurable way.

// BACK // INDEX // NEXT //

To inquire about this project
in video, and printed formats,
send an email to project creator Dan Habib.

All photos ©2002, Dan Habib

## TEEN SEXUALITY
### in a culture of confusion



If one is constantly hyperconscious of one's appearance, if you feel that in order to be accepted or loved you have to be "perfect," a kind of vigilance and wariness is created which works against spontaneity and sexual enjoyment. Add anxiety about AIDS, concern about sexual performance, exhaustion from competition at school or work, all these factors which are working to put teens - not to mention their parents - very much out of touch with the more relaxed, sensuous pleasures of the body, and with a spontaneous, unguarded sense of life.

Many of my students are sort of shell-shocked. They crave escape from the pressures of their lives, but also many of them feel numb, empty. They'd like to just go to sleep, but they also want desperately to feel something other than vaguely depressed. I was shocked to find out how many of them are on Prozac and other anti-depressants. And, of course, drugs and alcohol remain key ways of both numbing out to pain and fear, while at the same time trying to get more spontaneous feeling, pleasure or intensity.

I think that we are in the middle of a major sea-change in the way people experience the world, themselves, and what they take to be "reality."

// BACK // INDEX // NEXT //

To inquire about this project
in video, and printed formats,
send an email to project creator Dan Habib.

All photos ©2002, Dan Habib

# TEEN SEXUALITY
## in a culture of confusion



When I was a teenager in the nineteen-sixties, we thought Twiggy had the coolest look. But very few of us imagined that we had to look like her, or could look like her.

Today, photograph and model have blurred. So much of our "reality" is pure image. And it is a perfected and retouched reality.

We don't see behind the scenes of that perfection. We don't see Cher's surgeries, we don't see Stallone's compulsive work-outs. We don't see the soft focus lens that takes years off anchormen and newscasters. We don't see numerous models throwing up their food every day. We only see the dazzling images of perfection and success - and feel bad about ourselves.

Even if on some level we "know" that Cher and many others have had numerous plastic surgeries, that knowledge seems to evaporate in the face of the images themselves. And so, the ordinary women who is not an actress or model begins to feel embarrassed or ashamed to present herself to a lover in less than "perfect" form. And in a sense she is being rational, because she understands that the imagination of her lover is probably also being shaped by the perfected images.

// BACK // INDEX // NEXT //

To inquire about this project
in video, and printed formats,
send an email to project creator Dan Habib.

All photos ©2002, Dan Habib



Men, too, are working out to sculpt and power-up their bodies.
Having muscles is no longer a sign that you are a jock or a manual
laborer. It doesn't just connote physical power, it connotes personal
power, discipline over the self. This new glamorization of discipline-
-to strenuous workouts, to building muscles, to burning away every
spare ounce of fat--reflects our turning to the body to achieve the
sort of control we no longer feel we have over other parts of our
lives.

I don't see the person who tries to conform as a mindless fool. But I
do see the fact that the culture requires such conformity as tragic,
and a waste of human resources.

We present ourselves to the world through our bodies. We show
ourselves--to friends, lovers, employers--and ask to be
acknowledged, accepted, loved, desired. And so, the body is where
popular culture has its greatest effect, especially on teenagers, who
want desperately to fit in.

// BACK // INDEX // NEXT //

To inquire about this project
in video, and printed formats,
send an email to project creator Dan Habib.

All photos ©2002, Dan Habib



Popular culture, of course, is not the factor in the way we experience our bodies. From the beginning of life, there is a sense of ambivalence about the body. On the one hand, it is a center of gratification. The baby is hungry - it gets fed. It's cold - t is covered. But we also experience the most frightening and intense frustrations, when those basic needs don't get met. Much of our lives are spent negotiating between these two poles of the body as a place of delight and the body as harboring unmet need, frustration, illness, and ultimately death.

In many ways, Western culture has been in flight from the body. We have whole religious and philosophical traditions that centered on acheiving control over the body, denying the bodies needs and repressing it's desires - especially sexuality.

Jumping way ahead to contemporary popular culture, that control idea remains central. Except now it is appearance and age rather than sexuality that is the focus of control. We must have no unsightly bulges and no bouncing flab, no wrinkles, so sagging, loose flesh.

// BACK // INDEX // NEXT //

To inquire about this project
in video, and printed formats,
send an email to project creator Dan Habib.

All photos ©2002, Dan Habib

# TEEN SEXUALITY
## in a culture of confusion



The fact is that all this obsession with control only leads to things being more out of control. Just as harsh dieting almost inevitably leads to binging, the suppression of sexuality makes us all the more obsessed with sex, all the more hungry, insatiable for its forbidden delights.

There are some new reasons why we try so hard to control the body in the second half of the 20th century. Our lives are becoming increasingly unmanageable and complicated. There is confusion about what it means to be a woman, to be a man. There are grave environmental problems. AIDS. An uncertain job market. Community is no longer the source of identity and support it once was. The mass media brings death and destructive and political upheaval to us on a daily basis.

In such a culture, the body can seem to be a place where some measure of control can be achieved by the individual. We see this in eating disorders, exercise compulsions, plastic surgery. Of course, these attempts to control the body are futile. The very fact that we have bodies--that we are mortal, perishable--means that we can never be masters of our lives.

I particularly fear for this generation whose sense of self-esteem is so connected to having a perfect body.

// BACK // INDEX // NEXT //

To inquire about this project
in video, and printed formats,

# T E E N   S E X U A L I T Y
## in a culture of confusion



What happens when that perfect body begins to resist all attempts to keep it perfect? What then do they rely on, what sense of self-worth will they draw on? I find this very, very disturbing.

Our culture is kind of hung-up on the idea of (self-esteem and) self-love. I see it as a way of focusing on the individual rather than on deep problems in the culture. Perhaps instead of focusing on self-love, we should be focussing on less obsession with the self, more directedness outside the self.

Getting involved in a social movement to change things, even on a small scale, such as at one's school or place of work, can shift one's sense of life significantly. You begin to develop bonds that are based on things other than romantic attraction or admiring someone's appearance.

You begin to feel that you are effective in the world in a context other than making yourself beautiful or making yourself thin. It's tremendously energizing, for body, soul, sexuality, everything. And I think that is much more effective at giving people inner resources to fight the abuses of the culture than anything else. When we're most integrated in the world we become much more sexual in a fuller, more expressive way.

*******

~Susan Bordo holds the Singletary Chair of Humanities at the Unversity of Kentucky and is the author of **Unbearable Weight; Feminism, Western Culture and the Body**.